WESTERN REALTY CO., a Nevada Corporation, Appellant, *v.* THE CITY OF RENO, a Municipal Corporation, Et Al., Respondents.

No. 3463

July 12, 1946.                         172 P. 2d 158.

George Lohse, of Reno, for Appellant.

Wilson & Skinner, of Reno, for Respondents.

## OPINION

By the Court, HORSEY, J.:

It appears from the record on appeal that the respondent, the city council of the respondent the city of Reno, Nevada, a municipal corporation, on the 1st day of October 1945, duly and regularly passed and adopted city ordinance No. 733, entitled, in part: "An ordinance creating and defining the boundaries of a special storm

and sanitary sewer and improvement district to be known and designated as 'Westfield Village Improvement District'; declaring the determination of the City Council of the City of Reno to make certain public improvements therein * * *."

And that said city council of the city of Reno, Nevada, did, on the 11th day of February 1946, duly and regularly pass and adopt city ordinance No. 745, amending said city ordinance No. 733; and that said city council of the city of Reno, Nevada, did, on the 15th day of April 1946, duly and regularly pass and adopt city ordinance No. 752, entitled, in part, "An Ordinance providing for and directing the issuance by the City of Reno of its negotiable coupon bonds in the amount of $82,992.63 to be called '1945 Westfield Village Improvement District Bonds' bearing interest at a rate not to exceed 2½% per annum for the purpose of providing funds to defray the cost of special improvements for the benefit of lands within that certain special storm and sanitary sewer and improvement district within the City of Reno, designated by City Ordinance No. 733 as 'Westfield Village Improvement District' * * *."

The appellant, Western Realty Co., a Nevada corporation, on April 22, 1946, commenced an action against respondents, the city of Reno, Nevada, et al. In the complaint in said action in paragraph IX thereof, it is alleged:

"That said City Ordinances, Exhibits 'A,' 'B' and 'C,' are void and invalid in that it is an attempt to authorize, to issue and to sell said municipal bonds in an unlawful manner, without authority of law and in violation of the authority vested in defendants by Section 10.30 of Article XII of that certain Act of the Legislature of the State of Nevada entitled:

" 'An Act to incorporate the town of Reno, in Washoe County, and defining the boundaries thereof, and to authorize the establishing of a city government therefor, and other matters relating thereto' as amended."

The act just above referred to is the Reno charter act, of 1903, as amended in 1905 and from time to time thereafter, including the amendatory act of 1945, Stats. of Nevada 1945, c. 223, pp. 398–440.

In said complaint the plaintiff, Western Realty Co., a Nevada corporation, prays that said city ordinances, designated in said complaint as Exhibit "A" (which is said city ordinance No. 733), Exhibit "B" (said city ordinance No. 745), and Exhibit "C" (said city ordinance No. 752), be declared invalid, and the defendants (respondents herein) be enjoined and restrained from issuing and selling said municipal bonds, authorized by said ordinances, and for general relief.

The respondents demurred to said complaint upon the ground that same did not state facts sufficient to constitute a cause of action, and on the 17th day of May 1946 the Second judicial district court of the State of Nevada, in and for the county of Washoe, department 2, the Hon. A. J. Maestretti, district judge, presiding, duly made an order sustaining said demurrer, but with leave to plaintiff (appellant herein) to amend its complaint on or before the 20th day of May 1946. A copy of the court's said order was duly served upon plaintiff's attorneys, on the said 17th day of May 1946. The plaintiff having failed to amend its complaint within the time allowed by said court, or at all, the said district court, on the 21st day of May 1946 rendered its judgment that the said complaint be dismissed, and that plaintiff and defendants, respectively, pay their own costs of suit.

From that judgment of dismissal, and the whole thereof, the plaintiff (appellant herein) has appealed.

The pertinent provisions of the charter of the city of Reno, Statutes of Nevada 1903, p. 184, c. 52, as amended from time to time, and as amended at the 42d session of the legislature, Statutes of Nevada 1945, pp. 398–440, are on pages 410 and 419 of the latter volume, and are as follows:

"SEC. 23. Article XII of the above-entitled act is hereby amended by adding thereto a new section which shall immediately follow section 10.26 and which shall be known as section 10.30 and which shall read as follows:

"Section 10.30. Bonds for the purpose of paying the cost of improvements for which special assessments are levied may be issued by the city in accordance with 'An Act to authorize municipalities to issue bonds for the purpose of paying the cost of municipal improvements for which special assessments are levied,' approved March 13, 1909, as the same has been or may hereafter be amended from time to time; *provided, however,* that such improvement bonds may be issued for any purpose for which a special assessment can be levied herein, and the purposes for which such bonds may be issued shall not be limited to the purposes for which special assessments can be levied under the terms of said act. Such bonds shall be payable out of the fund created by special assessment, but if such fund be insufficient to pay said bonds as they become due, the deficiency shall be paid out of the general fund of the city, and every improvement bond created by the city shall contain such a provision. In the event of any deficiency in the general fund it shall be mandatory for the city council to levy taxes in accordance with the provisions of this act, and particularly article XII, section 10.5 hereof in order to provide funds to immediately pay such bonds. No election shall be necessary to issue such improvement bonds irrespective of the fact that said bonds are also payable out of the general fund of the city.

\*      \*      \*      \*      \*      \*      \*

"SEC. 37c. Article XII of the above-entitled act is hereby amended by adding thereto a new section to immediately follow section 10.100 which shall be known as section 10.105 and shall read as follows:

"Section 10.105. All special assessments shall from the date of recording thereof, constitute liens upon the

respective lots or parcels of land and improvements assessed, and shall be charged against the persons and properties until paid. Upon the confirmation and recording of any assessment, the amount thereof may be divided into not more than twenty (20) installments, one of which shall be collected each year or the entire amount thereof shall be collected at once, in the manner hereinafter prescribed, with annual interest thereon at a rate not exceeding seven percent from the time due."

It will be noted that in section 10.30 of the foregoing amendatory act of 1945, the municipal improvement bond act of 1909 is referred to expressly, and provision thereby made for the issuance of bonds in accordance therewith for the purpose of paying the cost of improvements for which special assessments are levied. To the provision referring to said municipal improvement bond act of 1909, and, in a certain sense, adopting it as the basis of authorized bond issues, is the following proviso: "provided, however, that such improvement bonds may be issued *for any purpose for which a special assessment can be levied herein,* and the purposes for which said bonds may be issued shall not be limited to the purposes for which special assessments can be levied under the terms of said act." (Italics ours.)

It will be further noted that the provision in section 10.105, on page 419 of the Statutes of 1945, to the effect that the amount of the special assessment to create the fund from which the bonds shall be payable, "may be divided into not more than twenty (20) installments, one of which shall be collected each year * * *," is in conflict with the certain provision in said municipal improvement bond act of 1909, Nevada Compiled Laws 1929, vol. I, section 1382, which empowers or authorizes any incorporated town or city in the State of Nevada, whether incorporated under a general or special act, to issue bonds of such town or city "to be called 'Street Improvement Bonds,' payable in annual periods of one to not more than ten years from date * * *," and in

conflict with the certain further provision of said municipal improvement bond act, in section 1387, N. C. L. 1929, vol. 1, to the effect that "such bonds shall be payable in any period not exceeding ten years * * *."

The pertinent provisions of said municipal improvement bond act, which is entitled "An Act to authorize municipalities to issue bonds for the purpose of paying the cost of municipal improvements for which special assessments are levied," approved March 13, 1909, Nevada Compiled Laws 1929, vol. 1, sections 1382–1389, are in sections 1382 and 1387, in said vol. 1, N. C. L., and are as follows:

"Section 1382. May Issue Bonds for Street Improvements. § 1. Any incorporated town or city in the State of Nevada, whether incorporated under a general or special act, may, by ordinance, cause to be issued bonds of the town or city to be called '* * * Street Improvement Bonds,' payable in annual periods of one to not more than ten years from date, and to bear interest payable annually, not exceeding the rate of seven per cent per annum; * * *."

"Section 1387. Assessments Paid in Installments. When. § 6. * * * Such ordinance shall fix the form of the bonds, the denominations and interest; and such bonds shall be payable in any period not exceeding ten years, and the interest shall not exceed seven per cent per annum."

■ While it is not expressly stated in the said special act of 1945 amending the charter, that the provisions in said section 10.105 for dividing a special assessment into not more than twenty annual installments is intended as an exception to the provision in the preceding section 10.30 of such special act, to the effect that "Bonds for the purpose of paying the cost of improvements for which special assessments are levied may be issued by the city in accordance with 'An act to authorize municipalities to issue bonds for the purpose of paying the cost of municipal improvements for which special

assessments are levied,' approved March 13, 1909," it is clearly so intended.

The provision for the issuance of the bonds "in accordance with" the said above-entitled act of 1909 is general and is not intended to be construed literally to mean that the entire act of 1909, notwithstanding the express proviso in said section 10.30 and the implied exception in section 10.105, of the amendatory act of 1945, shall be deemed adopted by the force of the said general provision.

■ It is a well-settled rule of statutory construction that a special provision, dealing expressly and in detail with a particular subject, is controlling, in preference to a general provision relating only in general terms to the same subject. In sec. 367 of 50 Am. Jur., p. 371, the rule is well stated as follows:

"SEC. 367. General and Specific Provisions—It is an old and familiar principle, closely related to the rule that where an act contains special provisions they must be read as exceptions to a general provision in a separate earlier or subsequent act, that where there is in the same statute a specific provision, and also a general one which in its most comprehensive sense would include matters embraced in the former, the particular provision must control, and the general provision must be taken to affect only such cases within its general language as are not within the provisions of the particular provision. Additional words of qualification needed to harmonize a general and a prior special provision in the same statute should be added to the general provision, rather than to the special one. * * *"

In other worls, in providing, in effect, by the proviso above set forth, relative to the purposes for which the bonds of a municipality may be issued, "that such improvement bonds may be issued for any purpose for which a special assessment can be levied herein, and the purposes for which such bonds may be issued shall not be limited to the purposes for which special assessments

can be levied under the terms of said act" (meaning the municipal improvement bond act of 1909), it is clear that the legislature recognized the fact that the very limited purposes for which improvement bonds could be issued under section 1 of the said general municipal improvement bond act of 1909, N. C. L., vol. 1, sec. 1382, did not meet the legitimate needs and requirements of the people of the city of Reno. Said section 1 of said general act of 1909, N. C. L., vol. 1, sec. 1382, contains a statement of the purposes for which such bonds could be issued. The pertinent portion of said section 1 is as follows:

"Such bonds shall be issued for the purpose of paying the cost of laying the cement sidewalks, paving, macadamizing or otherwise improving the streets and alleys in said town, or city exclusive of the intersections of streets and spaces opposite alleys therein * * *."

There are certainly many legitimate public improvement wants and necessities of the people of any modern, growing city of the character and size of the city of Reno, that are not within the purview of this very narrow and restricted provision, which, when enacted in 1909, might have been sufficient to meet the legitimate needs and requirements of many of the smaller municipalities of the state.

In referring to the purposes as set forth in the amendatory act of 1945, section 10.15, Stats. 1945, p. 408, sec. 20, it is readily apparent that the powers therein set forth are comprehensive and include very many public improvements of a kind a modern city reasonably requires, which are not included in section 1 of the said act of 1909, N. C. L., vol. 1, sec. 1382. And, it will be remembered, said proviso in section 10.30 of the amendatory act of 1945, Stats. 1945, p. 410, provides, in substance, that the purposes for which such improvement bonds may be issued may "be * * * any purpose for which a special assessment can be levied *herein*" (italics ours), which plainly means any purpose set forth in the

said amendatory act of 1945, and particularly the purposes that are enumerated in said section 10.15, Statutes of 1945, p. 408.

It is very apparent, therefore, that the legislature, when it passed the amendatory act of 1945, meant, by the provision that "bonds for the purpose of paying the cost of improvements for which special assessments are levied may be issued by the city *in accordance with* 'An act to authorize municipalities to issue bonds for the purpose of paying the cost of municipal improvements for which special assessments are levied,' approved March 13, 1909," that such bonds may be issued *generally* under, or in accordance with, said general act of 1909, but that the applicability of the provisions of said act should be general, and with the qualification or modification above mentioned as to the purposes for which the bonds could be issued, such qualification or modification being expressed clearly by means of the said proviso, which expressly provided that the purposes should not be limited to those of the general act of 1909, N. C. L. 1929, vol. 1, sec. 1382, but should, by way of substitution, be those set forth in the said section 10.15 of the amendatory act of 1945, Statutes of 1945, p. 408. (Italics ours.)

Equally clear is the intention of the legislature in relation to the time within which the bonds should be payable.

The pertinent provision of said section 10.105 of the later special amendatory act of 1945 as above set forth, Stats. 1945, p. 419, is: "Upon the confirmation and recording of any assessment, the amount thereof may be divided into not more than twenty (20) installments, one of which shall be collected each year * * *," whilst, as has been hereinbefore stated, the provision of section 1 of the general act of 1909, N. C. L., vol. 1, sec. 1382, in relation to the time of payment of the bonds, states, in effect, that the bonds to be issued under the act shall be "payable in annual periods of one to not more than ten

years from date," and section 6 of said general act of 1909, same being N. C. L. 1929, vol. 1, sec. 1387, provides that "such bonds shall be payable in any period not exceeding ten years."

While it is true that the provision of section 10.105 above mentioned, of the amendatory act of 1945, is in relation to the installments of the *special assessments,* and that the above-mentioned provisions of the general act of 1909, with which it has been above stated to be in conflict, are in relation to the time when the *bonds* are payable, it cannot be reasonably concluded that the legislature, by said section 10.105 of the act of 1945, intended to provide a maximum period of twenty years for the assessments to create the fund from which section 10.30 of the same act requires the bonds to be paid, and yet adhere to the provisions of sections 1 and 6 of the municipal improvement bond act of 1909 requiring the bonds to be "payable in annual periods of one to not more than ten years." To so believe, we would have to conclude that the legislature intended to impose an unjustifiable burden upon the city. The bonds must be paid from the special assessments, according to the requirements of section 10.30, and such construction would mean that notwithstanding that such special assessments in the amounts to meet the bond payments may be in not more than twenty annual installments, which means that each installment would be for approximately one-twentieth of the amount of the bond issue, the bonds would have to be paid in not more than ten annual installments, each of which would be required to be in an amount sufficient to pay one-tenth of the bond issue. In other words, it would be inevitable that when the first installment payment on the bonds became due, there would have been realized, after the first installment of the special assessment had been paid in full, only approximately one-half of the amount necessary to pay the first installment on the bonds. In order to prevent default, it would, in the matter of the very first installment becoming due upon the bonds, be essential that the

deficiency be paid from the general fund of the city. This is in no sense, intended by the provision of section 1030, which is as follows: "Such bonds shall be payable out of the fund created by special assessment, but if such fund be insufficient to pay said bonds as they become due, the deficiency shall be paid out of the general fund of the city." Stats. 1945, sec. 10.30, p. 410. The legislature, by this provision, manifestly did not intend to impose upon the general taxpayers of the city the burden of paying one-half of each installment on the bond issue. The legislature did intend that a fund should be raised by special assessment, payable in sufficient annual installments to meet and pay the annual installments on the bonds, when due, and only in the event of a deficiency in the amount in such fund, after such annual installments, adequate in amount and times of payment to pay the amount of the concurrent installments of the bonds, would the condition arise whereby payments could be made from the general fund of the city. It is apparent that, to accomplish the essential uniformity, as between the installments of the special assessments to provide the necessary fund, and the installments in which the bonds must be paid, the period covered by the installment bond payments must be equal to, or longer than, the period covered by the installments of the special assessments.

But, as aforesaid, by the operation of the general municipal improvement bond act of 1909, the period of the installment bond payments cannot be longer than ten years, and the period of the special assessments is fixed, by said section 10.105 of the amendatory act of 1945, at not more than twenty years. It is essential to determine whether or not the legislature, by the later provision in section 10.105, intended to substitute the maximum period of twenty years, as provided for the special assessments, for the maximum period of ten years, as provided for the payment of the bonds. There is good reason to believe that the legislature did so intend.

Bearing in mind that the purposes for which the bonds may be issued under the later act, that is the amendatory act of 1945, include many more kinds of improvements, some of which are more extensive and necessarily require, in the aggregate, more money than the two kinds of improvements provided for in the general act of 1909, it is reasonable to conclude that the economic interest and financial welfare of the property owners and taxpayers to be affected would be better served by the twenty-year maximum period, both as to the installments of the special assessments, and as to the installments in which the bonds are payable, than they would be by the ten-year period. Furthermore, the bonds covering the twenty-year period are more readily marketable to advantage than those of the ten-year period, because they provide a more permanent and desirable investment.

It is clearly implied, therefore, from the said provisions of section 10.105 of the amendatory act of 1945, that the legislature, by said provisions in the later act, intended, by clear implication, to substitute the twenty-year period for the ten-year period as the maximum of the annual periods in which the bonds should be payable. It is, therefore, clear, that in providing that the bonds should be issued "in accordance with" the municipal improvement bond act of 1909, the words "in accordance with" meant that, in general, the said earlier act of 1909 should serve as a basis or as a general plan for the improvement bonds authorized by the amendatory act of 1945 (applicable only to the city of Reno), but that same should be modified and qualified by the clearly implied exception arising from the expression of section 10.105 as to the maximum period to be covered by the installments of the bonds to be issued. In substance, the legislature intended the provisions of the general act of 1909 to be operative in a general sense, in conjunction with the special amendatory act of 1945, but modified or qualified by certain well-defined exceptions,

one in the form of the said proviso set forth in said section 10.30, wherein the said amendatory act of 1945, greatly enlarged the scope of the provisions as to the purposes for which such bonds could be issued, and the other by virtue of the exception clearly implied from the provisions in section 10.105 of the amendatory act of 1945, substituting the period of twenty years in lieu of ten years as the maximum of the annual periods in which the bonds should be payable.

There was, technically, no reenactment by the legislature, in 1945 of the said municipal improvement bond act of 1909, nor was the latter incorporated in the former. By virtue of the said provision in section 10.30 of the amendatory act of 1945, that the bonds may be issued "in accordance with" the municipal improvement bond act of 1909, the legislature was merely, by reference, providing that the provisions of the latter should be generally adhered to and followed, subject to the proviso and the implied exception above noted. The said statement referring to the said general act of 1909 meant little except to accomplish the changes or modifications embodied in the proviso and in the implied exception. The city was already bound by the provisions of the general act, and the words referring to it, in the said section 10.30, indicate, perhaps, an election to proceed under that act, rather than to adopt an entirely new revised statute in substitution for it. The act of 1909 remained the act of 1909, with the modifications mentioned, and, as above stated, its provisions, while referred to and, in a sense, adopted in the amendatory act of 1945, were not re-enacted so as, technically, to become a part of the said amendatory act of 1945.

Considering the provisions of the two acts, that is the municipal improvement bond act of 1909 and the amendatory act of 1945, as to whether or not the provisions of the latter, applicable only to the city of Reno, can operate to control or supersede the operation of the provisions of the former with which it is in conflict, we

must be guided by certain well-established rules of statutory construction. As this court stated in its opinion in the case of Ronnow v. City of Las Vegas, 57 Nev. 332, on page 366, 65 P. 2d 133, 146: "The provisions of general and special acts must be harmonized when reasonably possible." In support of that principle, this court cited the following cases: State v. Rogers, 10 Nev. 319, at page 321; Ex Parte Ah Pah, 34 Nev. 283, at page 292, 119 P. 770; State v. Ducker, 35 Nev. 214, at page 224, 127 P. 990; State ex rel. Abel v. Eggers, 36 Nev. 372, at page 381, 136 P. 100; Dotta v. Hesson, 38 Nev. 1, at page 3, 143 P. 305; Presson v. Presson, 38 Nev. 203, at pages 208, 209, 147 P. 1081; Carson City v. Board of County Commissioners, 47 Nev. 415, at page 422, 224 P. 615; Wainwright v. Bartlett, 51 Nev. 170, at pages 177, 178, 271 P. 689, 62 A. L. R. 78; Bishop v. Musick Plating Works, 222 Mo. App. 370, 3 S. W. 2d 256, at page 259; Franzke v. Fergus County, 76 Mont. 150, 245 P. 962, at page 965.

And on pages 364 and 365 of 57 Nev., on page 145 of 65 P. 2d in the opinion in said case of Ronnow v. City of Las Vegas, supra, the following principles and rules for guidance, in determining the legislative intent in the matter of an earlier statute and a later statute containing certain repugnant or inconsistent provisions, are stated:

"A general law will not be held to be repealed or modified by implication by a subsequent special law, unless the subsequent special act is so clearly in conflict with the existing general law that both cannot stand. * * *

"Where express terms of repeal are not used, the presumption is always against an intention to repeal an earlier statute, unless there is such inconsistency or repugnancy between the statutes as to preclude the presumption, or the later statute revises the whole subject-matter of the former. * * *

"Where two statutes are flatly repugnant, the later, as a general rule, supplants or repeals the earlier."

Numerous cases are cited, on pages 364–366, of 57 Nev., on page 145 of 65 P. 2d relative to the foregoing rules, to which reference is hereby made.

For the reasons hereinbefore stated, it is shown beyond a reasonable doubt that the legislature intended, by the effect of the provisions of sections 20 and 23 of the later amendatory act of 1945, to substitute in the Reno charter act of 1903, as amended by the addition of a new section to article XII to be known as section 10.30, to immediately follow section 10.26 in said amended act, and by the addition of a further new section to be known as section 10.15, to immediately follow section 10.10 of said amended act, an entirely new revised statement of the purposes for which the bonds of the city could be issued, for and instead of those stated in section 1 of the general municipal improvement bond act of 1909, Nevada Compiled Laws 1929, vol. 1, sec. 1382. It is stated in said section 10.30, not only that "such improvement bonds may be issued for any purpose for which a special assessment can be levied *herein*" (undoubtedly referring particularly to the comprehensive and greatly enlarged list of purposes embodied in section 10.15), but, also, all of the purposes stated in the earlier general act are expressly incorporated in said section 10.15 of the amendatory act. This would have been surplusage, and, we may reasonably infer, would not have been done had the legislature not intended the broader and more comprehensive statement of the purposes of the later act, in said sections 10.15 and 10.30, as incorporated in sections 20 and 23 thereof, to supersede the provisions as to purposes in said section 1 of the earlier general act of 1909, sec. 1382, N. C. L. 1929, vol. 1.

Due to the plain repugnancy and inconsistency between the provisions in section 10.105 of the amendatory act of 1945, as incorporated in section 37c of the Reno charter Act of 1903, as amended, and added to article XII of said Reno charter act of 1903, as amended, immediately following section 10.100 of said amended act, and sections 1 and 6 of the earlier general act of

1909, as to the maximum of the annual periods in which the bonds to be issued under both acts shall be payable, which is accentuated in view of the enlarged and more comprehensive scope of the purposes as set forth in the later act, it was clearly the intention of the legislature that the later provision of section 10.105 should prevail and should supersede the earlier provisions in sections 1 and 6 of the act of 1909, both as to the number and the maximum period of the installments of the special assessments from which the bonds are payable, and as to the maximum of the annual installment periods in which the bonds shall be paid.

In said case of Ronnow v. City of Las Vegas, supra, this court had a very similar situation to consider and determine. In that case, the question involved was the validity of a proposed bond issue for the purpose of acquiring or establishing an electric distribution system for the city of Las Vegas. Section 6085, N. C. L. 1929, same being section 1 of an earlier general act entitled, "An Act relating to bonds issued by counties, cities, towns, school districts, and other municipal corporations, and repealing all acts and parts of acts in conflict therewith," approved March 23, 1927, provided that municipal bonds "shall be redeemed in equal annual installments; provided, however, that the first installment may be for a greater or a lesser amount than the remaining installments." The city commissioners proposed a bond issue in which the bonds to be issued would be in equal annual installments of $30,000, except the *last*, which should be $40,000.

The later act of 1935, amending the charter of the city of Las Vegas, provided that the board of city commissioners should have the power "to borrow money on the credit of the city for corporation purposes and to issue warrants and bonds therefor in such amounts and forms and on such conditions as the board of commissioners shall determine." Stats. 1935, p. 43. The later act in 1935, amending the charter of the city made no

express reference to the said municipal bonds act of 1927. This court, in its opinion in that case, stated that the said provisions of the earlier and the later act, respectively, were "so conflicting, inconsistent, and irreconcilable that in our opinion they cannot be harmonized, and cannot both stand. Such being the case, the special statute, being later, must prevail."

In the instant case, we adhere to the decision in Ronnow v. City of Las Vegas, supra, and hold, as to the precise question involved, that the provision of section 10.105 of the said amendatory act of 1945, as incorporated in section 37c thereof, and as added to article XII of the Reno charter act of 1903, as amended, providing, in effect, that the maximum period of the several installments of the special assessment from which the bonds shall be paid shall be twenty years, and, by implication, that a like maximum period of twenty years shall be applicable as to the time within which the bonds shall be paid, being a later expression of the intention of the legislature than the conflicting provisions of sections 1 and 6 of the general municipal improvement bond act of 1909, providing a maximum period of ten years in which the bonds shall be paid, shall prevail, unless same is unconstitutional.

We shall now address ourselves to the determination of the constitutional question.

In its brief, the appellant has cited article IV, section 21, of the constitution of the State of Nevada, and contends, in effect, that as to the term or duration of the bond installments, the provisions of the general act of 1909 providing as they do, in section 1 of said act, that the bonds shall be "payable in annual periods of from one to not more than ten years," and, in section 6 thereof, that the "bonds shall be payable at any period not exceeding ten years," are controlling, by virtue of said constitutional provision; that said general act is "applicable" within the meaning of article IV, section 21, of the constitution, and that, therefore, ordinances Nos.

733, 745, and 752 of the city of Reno, providing for a bond issue for municipal improvements and that the bonds shall be payable in twenty annual installments, are in violation of said constitutional provision, in that they do not conform to said ten-year limitation prescribed by virtue of said sections 1 and 6 of said general act of 1909.

The said constitutional provision, article IV, section 21, same being section 72, Nevada Compiled Laws of 1929, vol. 1, is as follows:

"In all cases enumerated in the preceding section, and in all other cases where a general law can be made applicable, all laws shall be general and of uniform operation throughout the state."

Before being prohibited by constitutional provisions such as the foregoing, the legislatures in many of the states, in the early days of statehood, had resorted to the passage of special acts on almost every conceivable subject. Many of these subjects were of general application and of great general importance, which required general legislation, not only to avoid individual discrimination and injustice, but, also, to assure a system of uniform and stable law to avoid confusion and chaos in legal administration.

Judge Dillon, in his excellent work upon the subject of municipal corporations, 5th ed., vol. 1, sec. 141, p. 244, has stated:

"SEC. 141. Policy and Purpose of Prohibition—The evils resulting from the unlimited power of the legislature over municipal corporations and the habitual and constant exercise of this power by special acts were so generally acknowledged that it was strongly felt that some remedy ought to be provided. The remedy devised and most commonly resorted to was provisions embodied in the later Constitutions of many of the States absolutely forbidding or greatly restricting the passage of *special acts* relating to *municipalities and to municipal affairs.* The scope and language of these provisions differ somewhat in the various States, but their general

purpose and policy are the same, namely, to reduce the evils of legislative control or interference with municipalities and municipal affairs by means of special acts, and to require such power to be exercised, if at all, by general acts. * * *"

In footnote 1, on page 246, of the same volume, Judge Dillon quoted from Ayar's Appeal, 122 Pa. 266, 277, 16 A. 356, 360, 2 L. R. A. 577, in which Sterrett, J., stated:

"During the session of the legislature immediately preceding the adoption of the present constitution, nearly 150 local or special laws were enacted for the city of Philadelphia, more than one-third that number for the city of Pittsburg, and for other municipal divisions of the state about the same proportion. This was by no means exceptional. The pernicious system of special legislation, practiced for many years before, had become so general and deep rooted, and the evils resulting therefrom so alarming, that the people of the commonwealth determined to apply the only remedy that promised any hope of relief. * * *"

But, in the same section 141, on said page 244, Judge Dillon said:

"Thirty years' experience with these general constitutional interdicts against local and special legislation have impressed the author with the conviction that they have failed to produce the beneficial results anticipated, and that this has been brought about largely because the prohibitions of special legislation are too broad and sweeping. Special legislation in some form is often necessary, and it should be allowed, but carefully safeguarded, much in the same way or on the same principles as in the present Constitution of New York. * * *"

Municipal administration is especially local in its nature, and local features peculiar to a municipality naturally call for special legislation. In the same section 141, on page 256 of the said volume I, the learned author has stated:

"Special legislation to meet the wants, requirements

and special needs of each municipality, rather than general laws *exclusively*, is consonant with the fundamental principles and policy of local self-government and home rule, and in our judgment the true remedy is not absolutely and sweepingly to prohibit such legislation, but to safeguard it from legislative abuse. Such is the plain lesson taught by thirty years' experience."

The framers of the Nevada constitution evidently were convinced of the very impelling reasons why, in many instances, a general law would not be adequate or suitable to meet the peculiar local needs, wants and requirements of a particular municipality, and, therefore, formulated and included within the constitution article VIII, section 1, Nevada Compiled Laws, vol. 1, sec. 131, which is as follows:

"Section 131. Special Act Concerning Corporations. § 1. The legislature shall pass no special act in any matter relating to corporate powers except for municipal purposes; but corporations may be formed under general laws, and all such laws may, from time to time, be altered or repealed."

It is apparent from the foregoing provision that the framers of the constitution sensed the danger of allowing private corporations to be formed, or their powers to be defined, by special laws, which often would be used, they doubtless feared, to confer special privileges and discriminatory benefits. They, nevertheless, realized, as of equal importance, the necessity of contributing substantially to the welfare and growth of self-governing municipalities, by excepting corporate powers *for municipal purposes* from the corporate powers in relation to which special legislative acts were prohibited. (Italics ours.)

It has been so well settled in this state, by numerous decisions, that special acts in relation to the formation of municipal corporations, and relating to their powers, are authorized by virtue of said article VIII, section 1, notwithstanding the provisions of section 8 of said article, N. C. L., vol. 1, sec. 138, to wit:

"The legislature shall provide for the organization of cities and towns by general laws and shall restrict their power of taxation, assessment, borrowing money, contracting debts and loaning their credit, except for procuring supplies of water; provided, however, that the legislature may, by general laws, in the manner and to the extent therein provided, permit and authorize the electors of any city or town to frame, adopt, and amend a charter for its own government, or to amend any existing charter of such city or town,"
that an extensive discourse as to the fundmental right of the legislature to provide, by special acts, such legislation as the local needs of such towns and cities reasonably require, is unnecessary. City of Virginia v. Chollar-Potosi G. & S. M. Co., 2 Nev. 86; State ex rel. Rosenstock v. Swift, 11 Nev. 128; State ex rel. Fletcher v. Ruhe, 24 Nev. 251, 52 P. 274.

■ While it is not the province of the courts to pass upon the wisdom of legislative policy, it is their function, in Nevada, to determine whether or not a general law is "applicable," within the meaning of article IV, section 21, of the constitution.

In McQuillin on Municipal Corporations, 2d ed. (Revised), vol. 1, sec. 208, pp. 608, 609, it is stated: "In some jurisdictions whether a general law can be made applicable is a legislative question. In others it is a judicial one." Nevada is listed by the author as being among the states holding that the question is a judicial one, and the following Nevada cases are cited, in footnote 81: Evans v. Job, 8 Nev. 322; Hess v. Pegg, 7 Nev. 23; State of Nevada ex rel. Clarke v. Irwin, 5 Nev. 111.

It is also well settled that this court has given equal weight to article IV, section 21, and has been careful, in scrutinizing and determining the constitutional validity of legislative acts, to ascertain whether or not the general acts brought, by litigation, within the scope of judicial determination, are, or can be made, applicable, in the sense intended by the restriction embodied in said section 21, commanding that "In all cases enumerated

in the preceding section, and in all other cases where a general law can be made applicable, all laws shall be general and of uniform operation throughout the state," and, impliedly, prohibiting special legislation where a general law can be made applicable. In a number of cases, in the early history of this state, as well as in later cases, this court has been called upon to determine whether or not a particular general act can be, or, if it has been theretofore enacted, is "applicable," in a con-. stitutional sense, in order to determine the validity of a special act, or certain provision thereof, which conflict with it, and the validity of which has been brought into question. State ex rel. Clarke v. Irwin, 5 Nev. 111; State ex rel. Ash v. Parkinson, 5 Nev. 15; Estate of Sticknoth, 7 Nev. 223; Ex Parte Spinney, 10 Nev. 323; Evans v. Job, 8 Nev. 322; State ex rel. Rosenstock v. Swift, supra; State v. Arrington, 18 Nev. 412, 418, 4 P. 735; Ex Parte Boyce, 27 Nev. 299, 75 P. 1, 65 L. R. A. 47, 1 Ann. Cas. 66; Pyramid Land & Stock Co. v. Pierce, 30 Nev. 237, 95 P. 210; Wolf v. Humboldt County, 32 Nev. 174, 105 P. 286; Quilici v. Strosnider, 34 Nev. 9, 115 P. 177; Dotta v. Elko County Bd. of Ed., 38 Nev. 1, 143 P. 305; State v. Shaughnessy, 47 Nev. 129, 217 P. 581; In re Calvo, 50 Nev. 125, 253 P. 671; In re Love-lock Irr. Dist., 51 Nev. 215, 273 P. 983.

In some cases the subject has been developed and the meaning of section 21 of article IV sufficiently elucidated to enable the formulation of a test, and its application to the situation existing in the particular case.

For instance, in State ex rel. Clarke v. Irwin, supra, Justice WHITMAN, in the opinion, on page 122 of said 5 Nev., furnished the following test of applicability:

"But would such a general law be applicable, is always the question. A law, to be applicable in the sense in which the words are evidently used, and their only proper sense in such connection, must answer the just purposes of legislation; that is, best subserve the interests of the people of the State, or such class or portion as the particular legislation is intended to affect."

In Evans v. Job, 8 Nev. 322, on page 333, Justice HAWLEY, in his opinion said:

"Sections 20 and 21 were doubtless incorporated into our State constitution to remedy an evil into which it was supposed the territorial legislature had fallen in the practice of passing local and special laws for the benefit of individuals instead of enacting laws of a general nature for the benefit of the public welfare. These sections were intended to prohibit the legislature from passing any local or special law in any of the cases enumerated in section 20, and to limit the passing of other local or special laws in all other cases where a general law would be applicable, that is to say, where a general law would be adapted to the wants of the people, suitable to the just purposes of legislation or effect the object sought to be accomplished.

"It is evident to our mind that the framers of the constitution recognized the fact that cases would arise in the ordinary course of legislation requiring local or special laws to be passed, in cases where in their opinion a general law might be applicable to the general subject but not applicable to the particular case. In other words, that a general law could not always be so moulded as to meet the exigencies of every case not enumerated in section 20. Without this right of discrimination the wheels of legislation would often be materially clogged and the wants and necessities of the people liable to be hampered and the relief to which they were otherwise entitled oftentimes necessarily delayed."

■ Applying to the instant case this criterion or test (formulated by Justice HAWLEY, for the purpose of determining the applicability, under section 21 of article IV of the constitution, of said provisions of the general municipal improvement bond act of 1909, it becomes clear that said provisions are not "adapted to the wants of the people" (of the city of Reno), and are not "suitable to the just purposes of legislation" nor to "effect the object sought to be accomplished."

Applying to the said general act of 1909 the test

enunciated by Justice WHITMAN in State ex rel. Clarke v. Irwin, supra, said general act does not "answer the just purposes of legislation; that is, best subserve the interests of the people of the state, or such class or portion as the particular legislation is intended to affect."

We have hereinbefore pointed out the particular respects in which section 1 of said general act of 1909, by reason of its very limited provision as to the purposes for which such improvement bonds may be issued, and the provisions in sections 1 and 6 of said general act of 1909, limiting the annual periods in which the bonds may be paid from one to not more than ten years, fail, in their adequacy or sufficiency, to best subserve the interests of the people of the city of Reno, and in which such restrictive provisions are unsuitable to effect the objects sought to be accomplished.

In Ronnow v. City of Las Vegas, supra, which is closely in point to the instant case, and, as before stated, involves a conflict between a general act and a special act, relative to the issuance of improvement bonds, this court, in an exhaustive opinion by Justice TABER, held that the provision of the special act in question was constitutional and that it superseded the general provision involved to the extent of the conflict. We have hereinbefore sufficiently related the facts of that case to make clear their similarity to the facts involved in the instant case. We shall decide likewise in the instant case.

Upon the particular question involved, namely, whether or not the provisions of sections 1 and 6 of "An Act to authorize municipalities to issue bonds for the purpose of paying the cost of municipal improvements for which special assessments are levied," approved March 13, 1909, which limit to not more than ten years the total of the annual periods within which such bonds shall be payable, are superseded by the provision in section 10.105, incorporated in section 37c of that certain act entitled, "An Act to amend an act entitled 'An act to incorporate the town of Reno, in Washoe County, and

defining the boundaries thereof, and to authorize the establishment of a city government therefor, and other matters relating thereto,' approved March 16, 1903, as amended March 13, 1905, and as amended from time to time thereafter," approved March 26, 1945, to the effect that the amount of the special assessment "may be divided into not more than twenty (20) installments, one of which shall be collected each year * * *," our holding and determination is that said provisions of the said general act of 1909 are superseded by the said provision of the special act of 1945, and that said provision of section 10.105 of the amendatory act of 1945 is constitutional. The special act is the later act, and undoubtedly the legislature intended that any portion thereof in conflict with the former act should prevail. The effect of our holding is that, by virtue and as part and parcel of the implication reasonably arising from the said provision of the special act of 1945, to the effect that such special assessment "may be divided into not more than twenty (20) installments, one of which shall be collected each year" (it being clearly implied that the legislature intended that the number of annual installments of the special assessment to pay such improvement bonds, and the period of time provided for the payment of such installments, and the number of installments and the total of the annual periods in which the bonds shall be payable, should conform), that the total of the annual periods in which the bonds shall be payable shall be not more than twenty years, instead of not more than ten years.

Consequently, pursuant to the evident intention of the legislature, the word "ten" in sections 1 and 6 of the said general act of 1909, said word "ten" being in line 5, section 1382, and in line 4, p. 416, section 1387, N. C. L. 1929, vol. 1, shall be deemed inoperative and obsolete, as to the city of Reno, and the word "twenty," arising from such implication, shall be deemed to supersede it and to be operative in its place and stead, by the force and effect of section 10.105, as incorporated in

section 37c of said amendatory act of 1945, and as added to article XII, immediately following section 10.100 of the said charter act of the city of Reno of 1903, as amended, and the implication clearly arising therefrom, and which is part and parcel of said provision.

It follows that ordinances Nos. 733, 745, and 752 of the ordinances of the city of Reno, the validity of which has been questioned by the appellant, said ordinances being in conformity to the provisions of said amendatory act of 1945, and also in conformity to said municipal improvement bond act of 1909, except as superseded to the extent herein held, are constitutional and valid.

In view of the foregoing determination, we conclude and hereby decide, that the plaintiff (appellant), in its complaint, failed to state facts sufficient to constitute a cause of action, and that the district court ruled and decided correctly in sustaining the defendant's (respondent's) demurrer to plaintiff's complaint, and in rendering its judgment of dismissal of the action.

The judgment of the district court is, therefore, hereby affirmed.

TABER, C. J., concurs.

DUCKER, J., not participating.